Syndicate Under Agreement on 7/8/40, W. M. Hart, H. C. Mattes and C. M. Hofman, Managers, 1 North LaSalle Street, Chicago, Illinois v. Commissioner.
Syndicate v. Commissioner
Docket No. 3500.
United States Tax Court
1945 Tax Ct. Memo LEXIS 143; 4 T.C.M. (CCH) 718; T.C.M. (RIA) 45249; June 26, 1945
*143 Harold D. Burgess, Esq., for the petitioner. Harold H. Hart, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income and excess-profits taxes for the calendar year 1940 in the respective amounts of $3,549.06 and $3,307.71, resulting from a determination that petitioner is an association taxable as a corporation. Findings of Fact On July 8, 1940, seven individuals, Harold C. Mattes, Alice Mattes, Charles M. Hofman, Mayme P. Hofman, Albert T. Candy, Sr., William M. Hart, and W. C. Hardy, residing in or near Chicago, entered into the syndicate agreement involved in this proceeding relating to certain industrial real estate located in that city. Two of the individuals referred to, Harold C. Mattes and Charles M. Hofman, were principal stockholders and directors of Belmont Radio Corporation hereinafter called Belmont. Alice Mattes is the wife of Harold C. Mattes and Mayme P. Hofman is the wife of Charles M. Hofman. Both were shareholders of Belmont. William M. Hart and W. C. Hardy are real estate brokers in Chicago. Albert T. Candy was a friend of William M. Hart. In April 1940, *144 and for several years prior thereto, the Grigsby-Grunow Company, an Illinois corporation, had been in bankruptcy in the United States District Court for the Northern District of Illinois. One of its assets consisted of improved real estate situated in Chicago. William M. Hart and W. C. Hardy, as real estate brokers, approached Harold C. Mattes and Charles M. Hofman, who were principal stockholders, and directors, of Belmont, with the suggestion that that corporation purchase the Grigsby-Grunow plant. At that time Belmont conducted its operations in two plants and was interested in consolidating its activities. After inspecting the property, Mattes and Hofman expressed their opinion that the property was too large for Belmont's needs, and that Belmont would be interested in purchasing a designated part, but not all, of the plant. Hart and Hardy advised them that the bankruptcy court had rejected previous offers to buy parts of the property, and that it was thought unlikely the court would entertain any such offer from Belmont. After consulting by long-distance telephone with the third principal stockholder of Belmont, Mattes and Hofman advised the brokers that Belmont could not undertake *145 the purchase of the entire property. Hart then suggested to Mattes and Hofman that the individual stockholders of Belmont join in the purchase, with Belmont paying two-thirds of the purchase price and the individuals paying the balance, and that he felt there would be no difficulty in selling the portion of the property not taken by Belmont. Mattes and Hofman were willing to participate in the enterprise, but the third principal stockholder of Belmont was not interested. Hart stated that he had a friend, Albert T. Candy, Sr., who would be willing to invest $15,000, and that Hart and Hardy would invest their commission on the entire sale, amounting to $12,750. On April 22, 1940, Hart presented a bid of $255,000 to the trustee in bankruptcy, which was accepted and approved by the court. An initial payment of $76,000 was made at that time, the remainder to be paid when the deed of conveyance was delivered. The bid was made in the name of William M. Hart, whoimmediately assigned his rights and interests thereunder to Belmont Radio Corporation. The amount of $76,000 paid at the time of the sale was received from the following sources: $50,667 from Belmont Radio Corporation; $12,666.50 *146 from Harold C. Mattes and $12,666.50 from Charles M. Hofman. On July 1, 1940, Belmont Radio Corporation paid the further sum of $94,333, in compliance with the request of the trustee in bankruptcy. Shortly thereafter, Horman and Mattes requested an attorney to prepare an instrument covering the agreement for the completion of the payment of the purchase price, and the disposition of the portion of the property not taken by Belmont. Such an agreement was prepared, and was signed by the parties on or about and as of July 8, 1940. The syndicate agreement recited that the premises had been bid in at bankruptcy sale in the name of William M. Hart for $255,000; that payments had been made on account of the purchase price by the Belmont Radio Corporation, in the amount of $50,667, by Harold C. Mattes in the amount of $12,666.50, and by Charles M. Hofman in the amount of $12,666.50; that a balance of $179,000 remained to be paid, together with a broker's commission to William M. Hart and W. C. Hardy in the amount of $12,750; that the bid had been assigned by Hart to Belmont Radio Corporation; that the parties had agreed that said corporation should acquire the west portion of the property, *147 therein described, for two-thirds of the bid price, plus two-thirds of the broker's commission, and that the parties desired to form a syndicate to acquire the premises therein described not taken by Belmont Radio Corporation, for $89,250, being one-third of the bid price plus one-third of the broker's commission and to sell the same. It provided that the parties to the agreement would pay to the syndicate managers certain specified amounts, aggregating $89,250. Harold C. Mattes, Charles M. Hofman and William M. Hart were designated as syndicate managers, who, or the survivor or survivors of whom, were to be the lawful agents and attorneys of the parties, with full power and authority in any two or more of them to exercise all of the rights and powers vested in them by the agreement. It further provided that upon the receipt by the Syndicate Managers of sufficient funds for the purpose, as provided, they should pay to the trustee in bankruptcy the sum of $85,000, including the credit for the amounts already paid by Mattes and Hofman, as consideration for the property to be acquired, and should cause title to be conveyed to Chicago Title & Trust Company, as trustee, by one of its *148 usual forms of trust deeds, which should provide, among other things, that the syndicate managers were entitled to receive and collect all the rents, income and profits from the properties, and that the trustee should deal with the property only on the written advice and direction of any two or more of the syndicate managers or their successors in office. In addition to his original contribution provided for, each party agreed to pay to the Syndicate Managers such additional amounts as might be necessary or desirable for the preservation, protection, management and maintenance of the property and its improvements, such assessments to be made on a pro-rata basis. The agreement provided that the interest of each party thereto should be deemed to be personal property, and, in the event of the death of any party prior to final distribution, should pass to the executors or administrators, and not to the heirs at law of such deceased parties, and that none of the parties shall at any time have any right, title, or interest, legal or equitable, in or to the real estate, as such, but only an interest in the earnings, avails and proceeds thereof; that the death of any party to the agreement *149 should not in any manner affect or limit the powers of the syndicate managers, and that no liability should attach to the premises or to any syndicate property by reason of any debt, default or miscarriage of any of the parties; that no party to the agreement should have any power to act for any other party, or create any obligation or indebtedness against any property of the parties except for the power and authority given the Syndicate Managers as such; and that the contract was not to be considered as creating a co-partnership. There was a further provision requiring any party who should desire to dispose of his interest under the contract, other than by gift or will. to offer it first to the other parties. The agreement required the Syndicate Managers, upon receipt of the initial capital contributions, to issue certificates of interest, which should be registered in books kept by the Syndicate Managers, and provided that no transfer of any certificate should be valid unless recorded on such books by authorization of the record holder, in which case a new certificate should be issued to the transferee. Provision was made for the issuance of a new certificate to a person who *150 might become entitled thereto by reason of such an event as the death or insolvency of the record holder, in which case the new owner should be entitled to all the benefits and subject to all the obligations as though he had originally contributed capital to the Syndicate. Neither the real estate involved here, nor any real property held by or for the Syndicate, could be sold or mortgaged unless a written summary of the terms of such proposed sale or mortgage had been given each of the parties at least 10 days prior to the sale or mortgage, nor if parties who had contributed 51 percent or more of the capital should file written dissents to the sale or mortgage. Subject to the specific limitations thereon, the Syndicate Managers were given the following rights, privileges, powers and authorities: 1. To sell any real or personal property at any time held by or for the Syndicate; 2. To exchange such property, or property and money, for any other property, or property and money; 3. To enter and take possession of the real property involved herein, and collect the rents, income and profits therefrom; 4. To rent, lease, license or enter into other agreements with respect to that *151 or any property held by or for the Syndicate for such term or terms of years as the managers should decide; 5. To obtain, acquire or furnish in connection with any sale, lease, exchange or other transaction with respect to said premises, policies of title insurance, abstracts of title, and other evidences of title; To make necessary or advisable alterations, repairs or reconstruction in any improvements at any time, and, in case of damage or destruction by casualty, to collect insurance moneys on that account, and apply it in the making of alterations, repairs or reconstruction; 7. To enter into party wall agreements; 8. To grant or acquire easements of any kind; 9. To subdivide or plat the real estate, to dedicate streets or alleys, to agree to the partition among persons interested; 10. To improve, or join with co-owners in improving real estate and to tear down, alter or reconstruct any structures on any such real estate; 11. To borrow money for any of the purposes of the agreement including the payment of expenses, or for the purpose of preserving, protecting, improving and operating the real estate, and to execute evidences of such indebtedness and to pledge syndicate *152 property as security therefor; 12. To insure syndicate property; 13. To sell or assign and to exercise voting privileges with respect to any shares of stock, bonds, or other security which the Syndicate might at any time own; 14. To institute and prosecute actions at law or in equity, and to settle any claims or demands brought against the Syndicate or its property; 15. To pay all taxes and assessments; 16. To employ and pay the compensation of such agents, employees, or attorneys as the Syndicate Managers deemed necessary. The agreement required the Syndicate Managers to deposit the syndicate funds in a bank, checks to be signed by any two of the Syndicate Managers, or any person designated by them to do so. Title to real estate was to be taken in the name of Chicago Title and Trust Company, as trustee. The Syndicate Managers were to secure from Belmont Radio Company an agreement to furnish heat to the premises involved here. They were not to be entitled to any compensation for their services as Snydicate Managers. Whenever, in their judgment, there should be on hand more money than is needed for syndicate purposes, the managers were authorized to distribute such *153 excess pro rata to the parties to the agreement, and if there should be sufficient funds, to pay them 6 percent interest per annum, or such pro rata share thereof as the funds on hand permit. If there be funds left after these amounts have been paid, then the balance should be distributed pro rata to the parties. The agreement was to continue in force for three years, unless sooner terminated, and for such period thereafter as the Syndicate Managers should find necessary to preserve the interests of the parties. Authority was given to the Syndicate Managers, if they deemed it desirable, to cause title to all property held by or for the Syndicate to be conveyed to a corporation to be formed, in which event shares of its stock were to be distributed to the parties, and the syndicate agree ment terminated. The Syndicate Managers were in such event, to be directors of the corporation. In the event of the death, resignation or incapacity of any of the Syndicate Managers, any of the parties who should then have contributed 51 percent or more of the then capital of the Syndicate might, in writing, designate the successor. The Syndicate Managers were not required to incur any personal *154 liability or responsibility, and were authorized to contract to limit their liability to property under their control as Syndicate Managers. They and the Chicago Title & Trust Co., as trustee, were relieved of liability for any acts or omissions except such as result from their own wilful conduct, wilful fraud or bad faith. Early in July 1940 the trustee in bankruptcy, having received the bid price from Belmont and the syndicate members, executed a deed, dated July 8, 1940, conveying to William M. Hart, trustee, the Grigsby-Grunow real estate. The initial contributions, totaling $89,250, called for by the syndicate agreement, were paid directly by or for the syndicate members to the trustee in bankruptcy. By a deed dated the same day, William M. Hart conveyed to the Belmont Radio Corporation that real estate which it had agreed to take, and to the C.T. & T. Co., the syndictae property. On the same date, a trust agreement was executed by the Chicago Title & Trust Co. and the syndicate members, relating to the remainder of the real estate. It recited that Chicago Title & Trust Co., which was about to take title to that real estate, would hold it, and any other real estate thereafter *155 deeded to it thereunder, for the uses and purposes set forth in the trust agreement; that the Syndicate Managers were entitled to the earnings, avails and proceeds of the real estate, and that the interest of any beneficiary under the Syndicate agreement consisted solely of a power of direction to deal with title, and to manage and control the real estate; and that the right of the beneficiaries was deemed to be personal property, which might be assigned and transferred as such, and, in case of death of a beneficiary would pass to his executor or administrator. No beneficiary was entitled to any right, title or interest in the real property as such, and the death of a beneficiary did not terminate the trust. An assignment of any beneficiary interest was not binding unless lodged with the trustee. The trustee could resign, in which event the Syndicate Managers could appoint a successor. The trustee could deal with the trust real estate only when authorized to do so in writing by the Syndicate Managers. If any property remained in the trust after 20 years from its date, it should be sold at public auction, and the proceeds given to the beneficiaries. Prior to September 9, 1940, Belmont *156 Radio Corporation purchased a portion of the real estate owned by the syndicate, and on that date Chicago Title & Trust Co., pursuant to written direction of the Syndicate Managers, delivered a deed therefor dated September 5, 1940. In October 1940, the Pioneer-Gen-E-Motor Corporation negotiated for the purchase of the west part of the syndicate property, and on November 13, the Syndicate Managers delivered an order to Chicago Title & Trust to enter into an agreement for the conveyance of that property. On November 15, 1940, such a contract was executed with Pioneer Gen-E-Motor Corporation, dated October 25, 1940, and recorded November 16, 1940. The sales to Belmont Radio Corporation and Pioneer Gen-E-Motor Corporation resulted in a net short-term capital gain of $19,420.41, which together with such incidental income as rents and interests, made a total income of $22,143.70 received by the Syndicate Managers. An income tax return was filed for the Syndicate with the collector for the first district of Illinois, prior to March 15, 1941, on a partnership return, showing the receipt of $22,143.70, and the amount thereof taxable to the individual members of the syndicate, who were *157 directed to include it in their individual return for 1940. In June of 1941, Zenith Radio Corporation purchased for cash the remaining real estate owned by the Syndicate. It was conveyed by Chicago Title & Trust pursuant to direction of the Syndicate Managers. On July 26, 1943, Pioneer Gen-E-Motor Corporation, having finally paid the contract price for the real estate purchased by it, received title thereto from the Chicago Title & Trust Company, as trustee. No certificates of beneficial interests were ever issued by the Syndicate Managers as required by paragraph seven of the agreement. Some of the interests were assigned and written notice given the Syndicate Managers, who recognized the new owners. No other property was acquired by the Syndicate or dealt with and the Syndicate members did not contemplate dealing in any other property. No leases on the property were executed, but certain tenants who occupied parts of the property at the time of its conveyance by the trustee in bankruptcy, under month-to-month tenancies, or under leases subject to cancellation upon notice, were allowed to remain in the property until its sale, and rents were paid to the Syndicate by these *158 tenants. No extensive alterations or repairs were made except to restore the premises after damage by fire. The Syndicate had no office, no business name, held no formal meetings, had no stationery, seal or minutes. The records kept by the Syndicate consisted of a check book and bank book, and monthly reports were made to the members showing receipts and disbursements. Syndicate Managers received no compensation for their services, and the Syndicate Agreement was not formally extended beyond its original expiration date of July 8, 1943. The Syndicate members entered into the joint enterprise for the purpose of mutual profit. The Syndicate created by them as the medium for the conduct of the business enterprise was an association taxable as a corporation within the meaning of section 3797 (a) (3) of the Internal Revenue Code. Opinion KERN, Judge: Respondent has determined that petitioner is an association taxable as a corporation under the terms of section 3797 (a) (3) of the Internal Revenue Code, pointing out, in support of his position, the existence of the following facts: there were several "associates", who contributed the *159 original capital of the enterprise in order to acquire the real estate involved here, for the purpose of resale at a profit; Syndicate Managers were appointed and given broad managerial powers, subject to control in certain respects by the members; the interests of the individuals were characterized as personal property, and were subject to transfer, and some were transferred, without affecting the continuity of the enterprise; the death of a member was not to affect the continuance of the enterprise; and, respondent contends, there was also a limitation of liability. Petitioner contends the Syndicate was a liquidating trust, taxable as a pure trust, and not as a corporation; and that it had no business purpose or activity. Petitioner does not question the existence of any of the features relied on by the respondent except the business purpose, and the limitation of liability. No matter how great the resemblance is to a corporate form, if the venture lacked a business purpose, it would not be taxable as a corporation, and, further, no matter how unmistakable the commercial character of the project, if it is not conducted by means of an organization bearing a substantial resemblance *160 to a corporation, it is not taxable as such. Petitioner urges that the parties had no intention of carrying on a business, beyond the disposition of the single piece of real estate originally acquired, and the testimony offered at the hearing bears this out to some extent. But we are required by Morrissey et al. v. Commissioner, 56 S. Ct. 289, 296 U.S. 344, and Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S. Ct. 285, to look to the terms of the instrument creating the trust for its purposes. The parties may not claim the purposes were narrower than those outlined there. The trust instrument here recites that the purpose for which it was formed was to "acquire and sell" the real property which it did acquire and sell. The record discloses that it was the intent and purpose of the individuals who formed the syndicate that the property be sold at a profit. The managers were given specific power (a) to sell; (b) to exchange; (c) to take possession; (d) to rent or lease; (e) to furnish evidences of title; (f) to make necessary or advisable alterations, repairs or reconstruction, and to use insurance moneys therefor; (g) to make party wall agreements; *161 (h) to grant easements; (i) to subdivide, plat, and dedicate streets and alleys; (j) to improve and join with co-owners in improvements; (k) to borrow money, (l) to make extensions and renewals of loans; (m) to indemnify title companies; (n) to insure; (o) to sell any securities owned or controlled, and to exercise rights thereunder; (p) to prosecute legal actions; (q) to settle and compromise claims; (r) to pay taxes and assessments; and (s) to employ attorneys and agents. The acquisition of real estate for the established purpose of resale at a profit seems clearly to be an enterprise of a business or commercial character. The fact that only one parcel of real estate, or one piece of property is involved does not prevent the taxation of the enterprise as a corporation. Swanson et al. v. Commissioner, 56 S. Ct. 283, 296 U.S. 362; Helvering v. Coleman-Gilbert Associates, supra.Title Insurance & Trust Co. v. Commissioner, 100 Fed. (2d) 482. Helvering v. Combs, 56 S. Ct. 287, 296 U.S. 365. Petitioner insists the Syndicate was a liquidating trust, taxable as a pure true, and if it can be qualified as primarily a liquidating trust, *162 the fact that it carried on some business activity, or earned a profit, incidentally, would not subject it to tax as a corporation. But we are not referred to any case where a trust formed for the purpose of acquiring property by purchase, for resale, has been held to be a liquidating trust. In numerous other cases the trusts or syndicates which did purchase the property which they held have been held taxable as corporations, though in most such cases no claim has been made that they were liquidating trusts: Russell Tyson et al., 20 B.T.A. 597; Zenith Real Estate Trust, 21 B.T.A. 656; G. F. Sloan, 24 B.T.A. 61, affirmed 63 Fed. (2d) 666; Adelaide Park Land, 25 B.T.A. 211. Bing & Bing, Inc., 35 B.T.A. 1170. In order to have property to liquidate, it was necessary first for petitioner to purchase it. We think the term "liquidating trusts" should properly be limited to trusts created for the paramount purpose of liquidating property already held by the creators of the trust. In an effort to qualify the Syndicate as a liquidating trust, petitioner suggests that the property here was owned by the Syndicate *163 members before the formation of the syndicate. But the facts do not support that conclusion. The bid was made in the name of one member and was accepted, and a down payment was made by two of the other members. But the balance of the purchase price was paid and title transferred at almost exactly the same time the syndicate agreement was executed, or at least the agreement and the trustee's deed bear the same date. The oral evidence clearly indicates that at the time the final payments were made and title transferred, the syndicate agreement had already been drawn up. Title was taken in the manner and according to the provisions of the syndicate agreement, although the payments were, in fact, made direct by the members to the trustee in bankruptcy, rather than to the Syndicate Managers and by them to the trustee, as the agreement provides. Title to the property was never held by the individuals prior to the execution of the syndicate agreement. We do not think it is permissible to extend to this factual situation the definition of a liquidating trust. We therefore hold this syndicate was not a liquidating trust. As we have said, even though the syndicate was organized for a business *164 purpose and with the intent to make a profit, it is not taxable as a corporation unless it substantially resembles the corporate form. Of the features relied on by respondent to identify the syndicate with the corporate form, petitioner questions the existence only of the limitation of liability. The agreement does not expressly provide for such a limitation. It provides that no liability shall ever attach to any syndicate property by reason of any debt, default or miscarriage of any of the members; that none of the parties shall have any power to create any obligation against any property of any other member, except for the express powers granted the Managers, as such. Among those powers is one authorizing the Managers to assess the members for such amounts in addition to their original contributions as may be required for the preservation, protection, management and maintenance of the property; and the Syndicate Managers were authorized to contract against their own personal liability. These are the principal provisions of the agreement which relate to the liabilities of the members. However, it seems unnecessary to enter into a protracted discussion of the practical effect of *165 these provisions, since it has been held that the omission of a provision for limited liability is not decisive. Bert v. Helvering, 92 Fed. (2d) 491; Renwick v. United States, 87 Fed. (2d) 123; Del Mar Addition, 40 B.T.A. 833; affirmed 113 Fed. (2d) 410; Jordan Creek Placers, 43 B.T.A. 131; Lee H. Marshall Heirs, supra. The absence of this express provision, therefore, does not prevent the taxation of the syndicate as a corporation where it otherwise resembles substantially the corporate form. Each of the other features set out in Morrissey et al. v. Commissioner, supra, is present here, and we conclude the resemblance to the corporate form is sufficiently substantial to warrant its taxation as a corporation. Petitioner suggests that this case is distinguishable on the ground that the entire enterprise which gave rise to this proceeding was incidental to the purchase by Belmont Radio Corporation of the space required for its use. As to those four members who were stockholders of Belmont, it may be assumed that they had an interest in the acquisition by Belmont of suitable quarters; as to the two members *166 who were real estate brokers, they were doubtless interested in consummating the sale for the sake of their substantial commission; as to the seventh investor, it is difficult to conceive of his having any other interest than the realization of a profit, except possibly the accommodation of a friend. He did not know and was not known by the members of the Syndicate who were officers of Belmont. His participation was enlisted by the real estate brokers, who described him as a friend. We are not convinced that any of the parties would have so elaborately arranged and embarked upon the enterprise except in the hope of realizing profit, whatever additional interests and motives they may have had. The fact that the idea and opportunity was suggested by some primary business activity of some of the participants is not decisive, we think, so long as the enterprise itself was undertaken for a business purpose and in a form resembling a corporation. The fact that some of the parties may have had additional reasons and interests is not material in determining the taxable status of the organization. Respondent did not err in his determination. Decision will be entered for the respondent. *167